

ORIGINAL

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

JUN 3 0 2008

CLERK, U.S. DISTRICT COURT
By_____
Deputy

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | Civil Action No. |
| v. | § § | |
| MICROTUNE, INC., DOUGLAS J. BARTEK and NANCY A. RICHARDSON, | § § § § | **3-08CV1105-B** |
| Defendants. | § § | |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") alleges:

### SUMMARY

1.     From at least August 4, 2000, the effective date of Microtune's initial public offering, through mid 2003, Microtune, Inc., Douglas J. Bartek (Microtune's former Chief Executive Officer), Nancy A. Richardson (Microtune's former Chief Financial Officer and General Counsel) caused Microtune, Inc. to engage in a fraudulent stock-option backdating scheme. The backdating scheme was designed to provide executives and other employees with valuable "in-the-money" options without recording the required compensation expense in Microtune's books and records and financial statements.

2.     The backdating scheme gave the false appearance that Microtune had granted *at-the-money* options to Microtune senior executives and other employees. In fact, Microtune had granted *in-the-money* options. "*At-the-money*" describes an option granted with an exercise price equal to the underlying security's market price on the date of grant. In contrast, "*in-the-money*" describes an option granted at an exercise price less than the underlying security's market price

on the date of grant. The exercise price is the amount the option owner must pay to exercise the option and receive the underlying security.

3.    Throughout the scheme, Bartek, with substantial assistance from Richardson, routinely backdated the date on which stock options were granted to executives and employees. This undisclosed practice ensured that those options falsely appeared to have been granted on dates corresponding to low points of the closing price of the company's stock, thus resulting in artificially low exercise prices for those options. Bartek and Richardson then falsified or directed others to falsify stock option records to make it appear that the options were granted "at-the-money."

4.    Bartek and Richardson's stock option misconduct fell into three categories: (i) backdating grants to newly hired executives and other employees; (ii) backdating large block grants to officers and rank-and-file employees; and (iii) granting (backdated) options, cancelling those options when the company's stock price dropped precipitously and subsequently re-granting the same options at substantially lower exercise prices, all without recognizing the appropriate accounting impact.

5.    First, to backdate new-hire grants, Bartek employed a "look-back" procedure. This involved selecting a grant date with the lowest stock price during a "window-period" (generally, the 14-day period after the hire date) as the supposed option grant date. To make it appear that the options had been granted on the earlier date, Richardson or Bartek instructed his or her administrative assistant to create backdated option grant approval documents. In some instances, Bartek also instructed his assistant to backdate employment offer letters and other new-hire documents to conceal from the company's auditors that the purported grant dates preceded the employees' actual hire dates.

6.     Second, at Bartek's direction and with Richardson's assistance, Microtune backdated large block grants (or "Evergreen" grants) by selecting grant dates and corresponding exercise prices that preceded the date that the company actually determined to make such grants. In some cases, Evergreen grants were backdated by several months. And on several occasions, they were backdated to dates corresponding with one of the lowest stock prices during the preceding quarter or calendar year, thereby creating substantial, hidden "in-the-money" benefits.

7.     Finally, in at least two instances involving a large number of employees, at Bartek's direction with Richardson's assistance, Microtune granted backdated options, cancelled those options when the company's stock price dropped precipitously and subsequently re-granted the same options at a substantially lower exercise price. The re-grants were not, as required, accounted for using variable accounting – in part, because Richardson concealed the nature of the re-grants from Microtune's outside auditors and others. She also falsified an E&Y stock compensation review checklist in connection with Microtune's 2002 audit. Therein, she falsely stated that, among other things, Microtune had not "indirectly reduced the exercise price of a fixed stock option, or offered to do so, by canceling an outstanding award and granting a new award with a lower exercise price . . . within six months."

8.     Option backdating and other option misconduct rendered Microtune Commission filings misleading as to material facts.   Under generally accepted accounting principles ("GAAP") in effect throughout the relevant period, Microtune was required to record and recognize over the vesting period of the option an expense in its financial statements for any *in-the-money* options in an amount equal to the difference between the exercise price and the quoted market price of the company's stock. As a result of the backdating scheme, Microtune did not record the expense required by GAAP. Consequently, Microtune materially understated

its expenses and materially overstated its net income in more than 15 Commission filings. Moreover, certain Microtune Commission filings falsely represented that Microtune had granted options at fair market value (i.e., at-the-money).

9.     By committing the acts alleged in this Complaint, Microtune directly and indirectly engaged in acts, transactions, practices, and courses of business that violate Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B) and 14(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b), 78(m)(b)(2)(A) and 78(m)(b)(2)(B)] and Rules 10b-5, 12b-20, 13a-1, 13a-13, and 14a-9 [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, 240.13a-13, and 240.14a-9], thereunder;

10.     By committing the acts alleged in this Complaint, Bartek and Richardson directly and indirectly engaged in, and unless restrained and enjoined by the Court will continue to engage in, acts, transactions, practices, and courses of business that violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Sections 10(b), 13(b)(5), and 14(a) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(b)(5), 78n(a), and 78p(a)], and Exchange Act Rules 10b-5, 13a-14, 13b2-1, 13b2-2, 14a-3 and 14a-9 [17 C.F.R. §§ 240.10b-5, 240.13a-14, 240.13b2-1, 240.13b2-2, 240.14a-3, and 240.14a-9]. Bartek and Richardson aided and abetted Microtune's violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78(m)(b)(2)(A), and 78(m)(b)(2)(B)] and Exchange Act Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13].

11.     The Commission, in the interest of protecting the public from such fraudulent activities, brings this securities law enforcement action seeking judgment from the Court: (a) enjoining Microtune, Bartek, and Richardson from engaging in future violations of the

federal securities laws that they violated; (b) requiring Bartek and Richardson to disgorge all wrongfully obtained benefits, plus prejudgment interest; (c) requiring Bartek and Richardson to pay civil monetary penalties under Section 20(d) [15 U.S.C. § 77t(d)] of the Securities Act and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; (d) barring Bartek and Richardson from serving as officers or directors of any public company under Section 20(e) of the Securities Act [15 U.S.C. §§ 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]; (e) directing defendants Bartek and Richardson to repay bonuses and stock profits, under Section 304 of the Sarbanes-Oxley Act of 2002 [15 U.S.C. § 7243]; and (f) providing other appropriate relief.

## JURISDICTION AND VENUE

12.    Plaintiff Securities and Exchange Commission brings this civil enforcement action under Section 20(b) of the Securities Act and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 77t(b), 78u(d) and (e)].

13.    The Court has jurisdiction of this civil enforcement action under Section 22(a) of the Securities Act [15 U.S.C. § 77u(a)] and Section 27 of the Exchange Act [15 U.S.C. §§ 78(u)(e), and 78aa]. Microtune, Bartek, and Richardson made use of the means or instruments of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the acts, transactions, practices, and courses of business alleged in this Complaint.

14.    Venue is proper in the Northern District of Texas under Section 22(a) of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. §§ 77v(a) and 78aa] because Richardson is a resident and therefore an "inhabitant" of this district within the meaning of these venue provisions. Moreover, Microtune employees exercised Microtune stock options through their brokerage accounts established with a broker-dealer based in Dallas, Texas.

## DEFENDANTS

15.     Defendant Microtune is a Delaware corporation based in Plano, Texas. Microtune designs and markets radio frequency integrated circuits and subsystem module solutions for the cable, digital television and automotive electronics markets.   During the relevant period, the company's common stock was registered with the Commission under Section 12(b) of the Exchange Act and listed on the NASDAQ National Market under the ticker symbol "TUNE." From July 7, 2003 until April 26, 2004, Microtune's stock was quoted on the pink sheets after the company was de-listed for failing timely to file its periodic reports with the Commission.

16.     Defendant Bartek, 58, lives in Frisco, Texas.   He was Microtune's Chief Executive Officer and Chairman from the company's founding in mid-1996 until his forced resignation in 2003, which followed the completion of Microtune's internal investigation into a $19.2 million revenue-inflation scheme.

17.     Bartek is currently the Chairman emeritus of a private technology company based in Richardson, Texas.   While Microtune's CEO and chairman, Bartek reviewed, signed and certified periodic reports and registration statements.   Bartek also signed the letter to shareholders and the proxy statement (on behalf of the full board) for the proxy statements filed in 2001 and 2002 and disseminated to investors.  Additionally, in 2001 Bartek was one of the proxies appointed in connection with the proxy solicitation.   Bartek asserted his Fifth Amendment right against self-incrimination and refused to answer any questions posed during the investigation conducted by the SEC staff.

18.     Nancy Richardson (CPA), 49, has her permanent residence in Dallas, Texas. Richardson was Microtune's general counsel from April 2001 until her resignation in December 2003. In April 2002, Richardson assumed the additional role of senior vice president of finance.

In July 2002, Richardson became Microtune's Chief Financial Officer ("CFO") and served as both the company's CFO and general counsel until August 25, 2003, when Microtune installed a different CFO. Richardson is a Certified Public Accountant, licensed in Texas since 1983. She is currently the "Vice President – Corporate Development & Legal" of a publicly traded technology company. As general counsel and CFO, Richardson reviewed and signed proxy statements and periodic reports, and reviewed registration statements filed with the Commission and disseminated to investors.

## FACTS

### A.     Background

19.     Microtune compensated its employees, executives, and directors with stock options. Each option gave the grantee the right to buy one share of Microtune common stock from the Company at a set price, called the *exercise price*, on a future date after the option vested. The option was *at-the-money* when its exercise price equaled the market price of Microtune's stock on the option's grant date and *in-the-money* when its exercise price was less than the market price of Microtune's stock on the option's grant date.

20.     Throughout the relevant period, Microtune told investors, in its filings, that it accounted for stock options using the intrinsic-value method described in Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB 25"). Under APB 25, employers were required to record as an expense on their financial statements the "intrinsic value" of a fixed stock option on its *measurement date*. The measurement date, as defined by APB 25, is the first date on which the following information is known:  (i) the number of options that an individual employee is entitled to receive and (ii) the exercise price. An option that is *in-the-money* on the measurement date has intrinsic value, and the difference between its exercise price and the underlying security's market price must be recorded as



compensation expense to be recognized over the vesting period of the option. Options that are *at-the-money* on the measurement date need not be expensed.

**B.    Microtune's Option Plans and Disclosures**

21.    The granting of stock options to Microtune executives and employees, at all relevant times, was controlled by two stock option plans: the Microtune, Inc. 2000 Stock Plan ("2000 Plan") and the Microtune, Inc. 2000 Director Option Plan ("Director Plan" and together with the 2000 Plan, the "Option Plans" or the "Plans"). Microtune adopted the Option Plans, including any amendments thereto, after obtaining shareholder approval.

22.    Microtune's primary stock option plan, the 2000 Plan, prohibited the Company from granting incentive stock options with an exercise price less than the stock's fair market value on the date of grant. In other words, the plan did not allow incentive stock options to be granted "in-the-money." Nonetheless, the vast majority of options granted under the 2000 Plan were intended to qualify as incentive options. Despite the prohibitions in the Plan, Microtune, through Bartek and Richardson granted incentive options that were "in-the-money," *i.e.*, granted at exercise prices lower than fair market value on the grant date.

23.    Microtune's Option Plans also flatly prohibited granting backdated options. Specifically, the 2000 Plan provided that "[t]he date of grant of an [option] shall be for all purposes the date on which the administrator makes the determination granting such [option], or such other *later* date as is determined by the administrator." Despite this clear and explicit language, Bartek, with assistance from Richardson, routinely backdated stock option grants.

24.    The Option Plans tasked the Compensation Committee (a committee of several board members) with authority to administer the plans. The Compensation Committee made grants through meeting minutes or unanimous written consents. Bartek was delegated limited

authority to grant up to 5,000 options to non-officer employees and typically did so through a written consent entitled "Action by the Chief Executive Officer."

25.     Although the Compensation Committee technically retained the authority to approve larger grants and grants to Microtune officers and directors, in practice Bartek controlled and orchestrated the option grants for Microtune's officers with little, if any, involvement from the members of the compensation committee.  Bartek selected grantees, grant dates, and prices, and made all other decisions regarding options, which he then transmitted to Richardson or his assistant to be documented in the form of a written consent entitled "Action of the Chief Executive Officer" or, if necessary, a unanimous written consent of the Compensation Committee.

## C.     The 14-Day Look-back: Microtune's Backdated Option Grants To New-Hires

26.     As noted above, during Bartek's tenure, Microtune followed a regular practice of backdating new-hire stock option grants.  This practice was referred to by some as a "window policy" or a "look-back policy."  In implementing this look-back policy, Bartek instructed his assistant to: (i) receive a list from Bartek of all new-hire grants (and other grants for current employees that needed to be issued); (ii) wait "some reasonable period of time" (typically 14 days after the applicable hire date); (iii) print out a list of Microtune's daily closing stock prices during the look-back period, typically from Yahoo! Finance; (iv) highlight the lowest price during the look-back period; (v) prepare the unanimous written consents needed to grant the options for Bartek's signature and, where necessary, the signatures of Microtune's compensation committee; (vi) present the paperwork along with the list of closing stock prices to Bartek for his review and signature; and (vii) if necessary, send paperwork to the members of the compensation

committee for their signatures. Once the paperwork was fully executed, Bartek's assistant would then input the newly granted options into Microtune's electronic stock option database.

27. Nearly all, if not all, of the dozens of new-hire grants authorized during Bartek's tenure benefited from the look-back policy. Bartek insisted upon the implementation of the look-back policy. Moreover, the company's minute books include several unanimous written consents with attached print-outs from the Yahoo! Finance webpage, which were used to identify with the benefit of hindsight advantageous grant dates and exercise prices. In most cases, the Yahoo! Finance print-outs bore print dates days or weeks after the purported grant date.

28. A June 7, 2002 e-mail from Bartek's assistant documented the look-back policy: "what I try to [do] . . . for the new-hires is to look at a two week period from their date of hire for the best closing price."

29. Bartek used backdated options to attract key employees, including defendant Richardson, to join Microtune. On April 10, 2001, Microtune purportedly granted options to a group of new-hires and other employees at an exercise price of $4.98, the closing price on April 9, 2001; the $4.98 price was the second lowest closing price during the 2001 calendar year. Included among the April 10, 2001 new-hire grant recipients were defendant Richardson and the company's new vice president of sales (who would later become the company's chief operating officer and president).

30. In reality, it was not until April 24, 2001 – or two weeks after the new hires' start date – that Bartek selected the grant dates and exercise prices for the grants backdated to April 10, 2001; by April 24, the price of Microtune's common stock had increased to $10.25. Thus, the purported April 10 grants were more than $5 "in-the-money" on the true date of grant.

31.     The unanimous written consent of the Compensation Committee used to approve the April 10 option grants was not created until April 24, 2001 and was last edited on that same day, while the written consent of the CEO granting options to rank and file employees was created on April 11, 2001, but last edited on April 24, 2001.

32.     Included with the final signed copies of the written consents in Microtune's minute books was a chart from Yahoo! Finance setting forth historical prices for Microtune's stock from March 27, 2001 through April 23, 2001. Bartek's assistant highlighted on the print-out $4.98, the closing price for April 9, 2001, which represented the lowest price on the printed page.

33.     Bartek's assistant provided the Yahoo! price data to Bartek, so that he could select the exercise price and the accompanying "effective date" for the stock option grant. After Bartek, on April 24, selected the April 9 $4.98 price, Bartek's assistant prepared and completed the unanimous written consents for his signature and the signatures of the Compensation Committee.

34.     The April 10 option grants were not entered into Microtune's stock option tracking database until May 8, 2001 or later – providing further confirmation that such grants were substantially backdated.

35.     Bartek's own words confirm that the April 10, 2001 options were backdated. In an *April 20-21, 2001* e-mail exchange regarding one of the recipients of the backdated options, the employee's supervisor inquired about the options for his new employee: "Is it possible to wait until Tuesday to see what the stock price does, or do we need to move this week to lock in the lower price of a few days ago?" Bartek responded, "With this market you never know. If we

wind up OK on Tuesday, (i.e. $9 or $10 like it closed on Friday) and we get him a $4.95 option price, that should be pretty good."

36.     The April 10, 2001 backdated option grants gave rise to almost $1.8 million in unrecorded gross compensation expense.  On the date of grant, Richardson's backdated new-hire options were more than $424,000 in-the-money.

**D.     The Application of the Look-back to Backdate Evergreen Grants**

37.     At Bartek's direction and with Richardson's substantial assistance, Microtune backdated large block grants (or "Evergreen" grants) by selecting grant dates and corresponding exercise prices that preceded the date that the company actually determined to make such grants. In some cases, Evergreen grants were backdated by several months and, on several occasions, to dates corresponding with one of the lowest prices during the preceding quarter or calendar year. Because the Evergreen grants were typically company-wide, the financial impact of these backdated options was substantial.

38.     Other than the need for Compensation Committee approval, the Evergreen option process did not differ significantly from the new-hire option grant process.  These backdated consents created the false appearance that the "as of" dates included in the consents were the actual dates on which the option grants were approved by the Compensation Committee when in fact, as Bartek and Richardson well knew, those dates did not reflect the date on which the Compensation Committee took action, but rather had been selected with the benefit of hindsight to take advantage of substantially lower stock prices.

39.     For example, on October 2, 2001, Microtune purportedly granted options to a large number of employees at an exercise price of $10.21.  The stock price on October 2, 2001

was the lowest closing price for Microtune's common stock of any day within the fourth quarter of 2001.

40. In reality, Bartek did not select the grant date and exercise prices for the grants backdated to October 2, 2001 until much later.

41. In fact, the first mention of the October 2, 2001 grants appears in a November 29, 2001 e-mail from Bartek to members of the compensation committee. Bartek said, "I'm very delinquent in getting these out, so we will need to backdate some of the paperwork."

42. On December 3, 2001, Bartek forwarded his November 29 e-mail to Richardson. Richardson then drafted written consents that were backdated to give the false appearance that October 2, 2001 was the actual date on which the option grants were approved by the Compensation Committee.

43. While drafting the backdated October 2, 2001 written consent in early December 2001, Richardson was aware that the options, which were to be granted at an exercise price of $10.21 per share, would be substantially in-the-money on the date of grant. On December 2, 2001, Richardson e-mailed Bartek regarding a particular employee included in such option grants who joined Microtune following the completion of a merger transaction on October 15, 2001: "The only 'questionable' item is [the new employee.] Since the merger was [not] completed until October 15th, it is hard to justify the October 1 price of $10.21 for him. The October 15th price is $13.92. Please let me know if you feel strongly we should try to go with the early price."

44. Further, on November 30, 2001, Richardson exercised 4,000 of her own backdated new-hire options and sold the underlying shares at the then-current market price of Microtune's common stock, $21.35, netting a single-day profit of $65,232. A few days later, on

December 6, 2001, Richardson signed and filed with the Commission a Form 4 disclosing the exercise and sale. Thus, Richardson was aware of the market price of Microtune's common stock and therefore aware that the options purportedly granted as of October 2, 2001 (at $10.21 per share) were roughly $12 in-the-money on the true date of grant.

45.     The October 2nd options were not entered into Microtune's option tracking database until around December 27, 2001.

46.     To conceal the backdating of the October 2, 2001 option grants, Microtune, at Bartek's instruction, manipulated the hire-date of certain grantees. For example, Andrew Melder, a long-time friend and colleague of Bartek who was slated to become Microtune's president, received backdated options to purchase 150,000 shares dated as of October 2, 2001 that were $1.9 million in-the-money on the date of grant. Melder's new-hire documentation was backdated to give the appearance that he was employed on October 2nd.

47.     But Melder was not employed by Microtune until at least December 3, 2001, or more than two months after his option grant date. There is substantial evidence that Melder was not employed by Microtune until December 3, 2001 or later: (i) Melder's signed offer letter from Microtune, which was faxed and signed by Bartek on December 3, 2001 but backdated to September 30, 2001; (ii) a "Personnel Action Notice" regarding Melder executed on December 7, 2001; (iii) a payroll change report that lists Melder as a new employee added to Microtune's payroll during the semi-monthly pay period ending December 15, 2001; (iv) Melder's own resumé showing December 2001 as the start date for his employment with Microtune; (v) a December 3, 2001 company-wide e-mail from the office of the president stating "Please join me in welcoming Andy Melder back to Microtune"; and (vi) a November 29, 2001 e-mail from Bartek to the headhunter responsible for placing Melder at Microtune: "I heard

through the grapevine that we received a bill for Andy Melder. He hasn't started yet, so this is totally inappropriate."

48.    A December 26, 1999 e-mail from Bartek reveals the purpose behind the backdating of new-hire employment documentation: concealing the backdating scheme from Microtune's auditors. While discussing a new hire other than Melder, Bartek wrote, "His start date [March 3, 2000] as defined in his acceptance will be a problem, as auditors will see this and require an option price as of that time . . . . I'll bet his March date is the right thing to put in a letter for purposes of no conflict [with his current employer], but it will create a problem for the option price." In a subsequent e-mail, Bartek proposed setting the employee's start date as "the beginning of January" although he would not begin coming to the office until March 3, 2000. *"His formal acceptance letter shouldn't need to say anything about March."* (emphasis added).

49.    The October 2, 2001 backdated grants gave rise to almost $5.8 million in unreported gross compensation expense. Several officers, including Bartek and Richardson, received options that were substantially in-the-money. Bartek's backdated October 2, 2001 options were $933,750 in-the-money. Likewise, Richardson, who drafted the backdated unanimous written consent of the Compensation Committee authorizing the October 2, 2001 grants to officers, received option shares that were more than $448,000 in-the-money.

50.    As a further example of the backdating scheme, on May 2, 2001, Bartek purportedly authorized option grants to a group of employees (including Richardson) at an exercise price of $12.35, the closing price on May 1, 2001; the $12.35 price was the second lowest closing price from May 1, 2001 through September 17, 2001. The Action of the CEO used to approve the purported May 2, 2001 option grants was not created until June 26, 2001,

when the price of Microtune's common stock was $19.84. The options were therefore $7.49 in-the-money on the date of grant, conveying a substantial benefit to Richardson and others.

51. In a related June 26, 2001 e-mail from defendant Bartek to the company's then president entitled "New Options," Bartek wrote:

> [The employees] will be pleased with the [option] price. [Bartek's assistant] *pulled some tricks* on timing, and *we are documenting that this grant was done on May 2*, and therefore the closing price on May 1 is the option price: $12.35. *So, they're already almost $8 in-the-money*!! The info will go out to employees automatically within a few weeks, so you should inform them next week when you're back. I also put you down for 5K options vesting monthly over the next 18 months. That's the most I can do without Board approval. Technically I'm probably supposed to get approval for you as an officer, but *I'll just do it and ask permission later so that I can get you the low price* along with the others. (emphasis added)

52. As noted in Bartek's e-mail, he did not have the authority to include officers such as Richardson in the May 2, 2001 option grant without the approval of the Compensation Committee. Nevertheless, to ensure that defendant Richardson and the company's president got "the low price along with the others," Bartek willfully exceeded the authority delegated to him by the Compensation Committee.

## E. Cancelling and Re-granting Stock Options at a Lower Price

53. In two instances involving a large number of employees, Microtune stock options were granted, canceled and subsequently re-granted at a substantially lower exercise price. The re-grants should have been accounted for as an option re-pricing, which triggers the application of variable accounting.

54. Under GAAP, when variable accounting is triggered, compensation expense is recorded for the excess of the fair market value of the option shares over the stated exercise price. The compensation expense is adjusted for changes in the market price of the shares periodically until the option is exercised.

55. For example, on November 29, 2001, Microtune purportedly granted a large block of options to a group of new employees (that joined Microtune when the company consummated an acquisition transaction) at an exercise price of $18.05, the closing price on November 28. This grant was not approved by Microtune's Compensation Committee until at least at least three months later, on January 29, 2002, when Microtune's common stock was trading at approximately $20.50. Nonetheless, the options were backdated to reflect a grant date of November 29, 2001, making them $2.45 in-the-money on the true date of grant. A December 20, 2001 e-mail from Bartek to several executives sheds light on Bartek's intent:

> I have been delaying on [approving the options] partly to ensure that we get the lowest option price possible. Many of us were surprised that even with the secondary [offering] our stock did not go down temporarily. The lowest price since the merger was the day of the merger, and that was $18.05 (or close to this). WE HAVE TO MAKE A DECISION ON THIS. Do we get these into the system for 2001, in which case they have to be finalized by Jan 3 or 4 (ideally Dec 31), and use the $18.05 exercise price OR do we wait until early 2002 and see if the stock price goes down. . . . What I would hate to have happen is that we get the options issued at $18.05 stock price, and then a few days later [competitor] starts their hype and we drop to $15 or something like that. (emphasis in original).

56. Bartek apparently decided to wait until late January 2002 to see whether the stock price would fall. On or around January 28, 2002, Bartek instructed Richardson to draft the backdated Compensation Committee unanimous written consent approving the grants at $18.05, the November 29, 2001 price. The members of the Compensation Committee signed the unanimous written consent at a board meeting on or around January 30, 2002. A fully executed copy of the November 29 unanimous written consent was placed in Microtune's minute books.

57. Days later, on February 5, 2002, following the announcement of Microtune's fourth quarter earnings, Microtune's stock plummeted by over 26%, closing at $13.99. According to Bartek's assistant, some time shortly thereafter Bartek informed her that the November 29, 2001 options were being "pulled" to get a better option price.

58.     Bartek instructed his assistant to send an e-mail (copying Richardson) to the company's stock administrator on February 12, 2002: "It has been brought to my attention that our board did not approve the [option] shares for our San Diego employees, please delete the grants for those employees," which Bartek knew was false.

59.     On February 18, 2002, Bartek's assistant followed up with an e-mail requesting confirmation that the grants had been deleted from the system.  On or around March 29, 2002, Richardson prepared a new Compensation Committee written consent approving options to substantially the same group of employees included in the original November 29 grant.

60.     Like the purported November 29, 2001 grant, the replacement grants were backdated (in this instance to February 20, 2002) to target a lower exercise price ($11.77).  As such, Bartek was effectively able to reduce the exercise price of the November 29, 2001 grants from $18.05 to $11.77, while circumventing the required accounting implications.

61.     Before Bartek and Richardson were able to "cancel" the November 29 grant and replace it with the February 20 grant, copies of the signed November 29 unanimous written consents were apparently provided to E&Y in connection with the 2001 year-end audit.

62.     In an apparent effort to conceal the re-pricing from E&Y, Richardson sent an e-mail to a senior E&Y auditor on February 13, 2002 misrepresenting that the November 29 grant was a mistake, not a valid grant.  In pertinent part, Richardson's e-mail stated:

> Here are the three option grants that somehow Doug and I miscommunicated on and are being revoked/cancelled/whatever.  Somehow the list I received from Doug was different than what he e-mailed to the board and hence the resolutions do not reflect what was to be granted.  We discovered this yesterday when one of the individual's options came up in a conversation between Bill, Doug, and I and we had different recollections of where we stood.  As I said on the phone, some of these grants will probably be reissued during 2002 but with different vesting and some will never be issued at all.  Sorry for the confusion. . . . Luckily AST had not sent any of these option grants out to employees yet so I don't have to deal with that mess.

63.     Richardson's statements to Microtune's external auditors were misleading as the November 29 grant had been "revoked/cancelled/whatevered" not because of any miscommunication, but rather to, in Bartek's words, "ensure that we get the lowest option price possible."

64.     To further conceal this effective re-pricing from E&Y, Richardson provided false responses to a seventeen page Ernst & Young LLP Stock Compensation Review Checklist (APB Opinion No. 25) that she completed in connection with E&Y's 2002 year-end audit. E&Y's detailed APB 25 questionnaire was designed to elicit information regarding particular types of stock option transactions that could have serious accounting consequences.

65.     In the APB 25 questionnaire, Richardson falsely asserted that Microtune had not "indirectly reduced the exercise price of a fixed stock option, or offered to do so, by canceling an outstanding award and granting a new award with a lower exercise price . . . within six months"; or (ii) "grant[ed] an in-the-money award . . . any time after the cancellation of an out of the money stock option." Richardson knew, or at a minimum was severely reckless in not knowing, that her responses in the APB 25 questionnaire were false, and that E&Y would rely on them when conducting its audit of Microtune's 2002 Form 10-K.

**F.      Bartek and Richardson Understood the Implications of Their Misconduct**

66.     Bartek and Richardson knew and understood the applicable accounting rules. Both knew that granting "in-the-money" options triggered compensation charges. Bartek and Richardson sought to evade the requirement by falsifying stock option grant dates and directing the backdating of other documents to conceal the backdating scheme. In doing so, each was aware that Microtune and its external auditors relied on the falsified options documentation to prepare, review and audit the Company's financial statements.

67. Throughout his orchestration of the backdating scheme, Bartek understood the basic accounting rules governing stock options. For example, On August 24, 2000, he received an e-mail from Richardson's predecessor as general counsel regarding procedures for approval of options granted under Bartek's delegated board authority.

68. In the e-mail, the former general counsel explained to Bartek: ". . . each new employee gets as the option exercise price the closing price on the day before you grant the shares – not on the hire date or some other date. We can have some other date as the vesting commencement date, but the exercise price is determined solely by the grant date. If we deviate, we will get negative accounting implications."

69. Moreover, in connection with Microtune's initial public offering in 2000, Microtune engaged in extensive discussions with the Commission's Division of Corporation Finance regarding so-called "cheap stock" issues. Bartek, as CEO, reviewed comment letters from the Division and was involved in the internal discussions regarding the issue. Ultimately, Microtune recorded approximately $19.7 million of deferred stock option compensation as a result of granting stock options prior to its initial public offering "at exercise prices below the deemed estimated fair value" per share of the company's common stock.

70. As CEO, Bartek signed Microtune Commission filings in which the company correctly disclosed that "Under APB 25, no compensation expense is recorded when the exercise price of the Company's employee stock options equals the fair value of the underlying stock on the date of grant. Compensation equal to the intrinsic value of employee stock options is recorded when the exercise price of the stock options is less than the fair value of the underlying stock on the date of grant."

71.    Bartek also encountered stock option accounting issues in the context of Microtune's acquisitions. In one such instance, Bartek explained in a February 2001 e-mail to a group of Microtune officers:

> The company [i.e., the other potential acquirer] could be offering new options at a value lower than fair market value, but that is viewed by the financial community as somewhat reckless since the difference is treated as P&L expense, which would then negatively effect [sic] the stock price.

72.    Microtune also recorded unearned stock compensation expense in connection with another acquisition transaction because the target company had previously granted options at values less than fair market value. Based on his integral involvement in these acquisition transactions, it is inconceivable that Bartek failed to understand that if a company granted options at a price below the fair market value on the date of the grant then the company had to take a compensation expense.

73.    Bartek also understood the variable accounting implications of indirect re-pricings of options (e.g., the November 29 grant, cancellation and re-grant of options at a lower price). His understanding of the accounting policies is demonstrated by an April 9, 2001 e-mail exchange relating to the issuance of new options to employees who held "underwater" options. Bartek explained to Richardson's predecessor as CFO that "[t]here are no P&L issues associated with [the grant of new options]. I think you are thinking there is a re-pricing – that is not discussed below."

74.    A few days later in a response e-mail entitled "re-pricing of options," Richardson's predecessor as CFO advised Bartek that he could not avoid the accounting implications of a re-pricing. In pertinent part, he wrote:

> . . . if an option is cancelled and reissued within 6 months and 1 day, then the reissued option will be treated as compensation and TUNE will need to take a stock compensation hit each quarter until exercised . . . Now before you ask, we looked at all the sneaky ways around this and the intent is totally clear.

75. More importantly, Bartek understood the practical impact of backdating stock option grants. As he noted in his June 26, 2001 e-mail described above at paragraph 51, the effect of backdating stock options was to falsely "document that this grant was done on [an earlier date]" and that as a result the options "were already in-the-money" on the date of grant. In other words, Bartek knew that he was "pulling tricks" by falsely documenting that options were granted on dates prior to the actual grant dates in order to target low exercise prices and thereby create in-the-money options, all without recognizing the appropriate accounting implications.

76. Richardson was also aware of the accounting impact of in-the-money stock options. Richardson has a degree in accounting, a law degree and an MBA from the University of Texas. She is a highly trained lawyer and a certified public accountant with years of experience as general counsel at her previous employer, another publicly traded technology company. She also served as Microtune's general counsel and, from July 2002 to August 2003, Microtune's chief financial officer.

77. During the relevant period, Richardson reviewed and signed Microtune's Commission filings. Those filings falsely reported to investors that the reason the company did not record additional compensation expense for certain option grants was because it granted options with an exercise price equal to the fair market value of the stock on the day of the grant (i.e., they falsely represented that certain options were granted "at-the-money"). The filings omitted that the true reason for not recording compensation expense was the backdating scheme.

78. In addition, in her role as general counsel and the sole in-house lawyer at her former employer, Richardson had substantial involvement in drafting public filings and was involved in a number of complex stock option issues, including an amendment to her former

employer's stock option plan. The related proxy statement filed on April 20, 2001, which Richardson reviewed, drafted and signed in her capacity as secretary of her former employer, included a clear and accurate description of the APB 25 accounting consequences of granting options at exercise prices below fair market value.

79.     Specifically, the proxy statement disclosed:

> Option grants with exercise prices equal to the fair market value of the option shares on the grant date will not result in any direct charge to our reported earnings. . . . Option grants or stock issuances made . . . with exercise or issue prices less than the fair market value of the shares on the grant or issue date will result in a direct compensation expense to us in an amount equal to the excess of such fair market value over the exercise or issue price. The expense must be amortized against our earnings over the period that the option shares or issued shares are to vest.

**G.     Bartek and Richardson Caused Microtune's Commission Filings to be False and Misleading**

80.     As a public company, Microtune filed with the Commission and sent to shareholders annual reports that included audited financial statements, certified by the company's outside auditors, and unaudited quarterly reports. Microtune also filed with the Commission and sent to shareholders proxy statements in connection with its annual shareholder meetings in each year during the relevant period. At such meetings, Microtune shareholders were asked to consider, among other things: (i) whether to re-elect Bartek and the two members of the Compensation Committee to Microtune's Board of Directors (proxy statement filed March 22, 2001); (ii) whether to approve an amendment to Microtune's 2000 Director Option Plan that increased the number of shares available under the plan (proxy statement filed March 18, 2002); and (iii) whether to re-elect two members of the Board of Directors (proxy statement filed August 11, 2003).

81.     The Commission's rules and regulations require public companies (i.e., companies whose securities are registered under Section 12 of the Exchange Act ) to send to their shareholders a proxy statement prior to any shareholder meeting, whether an annual or special meeting.  The information contained in the statement must be filed with the SEC before soliciting a shareholder vote on the election of directors and the approval of other corporate action.   Proxy solicitations must disclose all important facts about the issues on which shareholders are asked to vote.

82.     During the relevant period, Microtune also filed registration statements with the Commission on Forms S-3 and S-8, which included and/or incorporated by reference false and misleading financial statements and fraudulent misrepresentations regarding Microtune's stock option compensation and related matters.  These registration statements include Forms S-3 filed on October 10, 2000, December 5, 2001 and December 19, 2001, an S-3 Amendment filed on December 23, 2002, and Forms S-8 filed on February 13, 2001 and December 7, 2001.

83.     Due to Bartek's and Richardson's backdating, Microtune failed to record compensation charges for numerous backdated grants in the financial statements included in Microtune's Annual Reports on Form 10-K for its fiscal years ended 1999 to 2006 and Forms 10-Q for the intervening quarters.  During the relevant time period, APB 25 and FAS 123 provided the basic GAAP governing stock option accounting.  FAS 123 permitted companies to continue to use the APB 25 intrinsic value based method to account for stock options.  During the relevant period, Microtune elected to continue to use APB 25 to account for its stock options and to present pro forma footnote disclosure required by FAS 123.

84.     Under APB 25, an employer must expense the "intrinsic" value of a fixed stock option on its "measurement date."  A fixed stock option has intrinsic value if the exercise price

of the option is less than the "quoted market price" of the underlying stock on the measurement date (i.e., if the option is "in-the-money" on the true date of grant). Thus, a corporation must record the difference between the exercise price and the quoted market price as the compensation expense. APB 25 defines the measurement date as the first date that: (1) the number of options that an individual employee is entitled to receive and (2) the exercise price are *known*. Accordingly, for most options, the measurement date will be the same date as the grant date.

85. Through the backdating scheme, Bartek and Richardson knowingly caused stock options to be granted at exercise prices less than the fair market value of Microtune stock on the date of the grant. Therefore, the backdated options were in-the-money on the measurement date and had intrinsic value on the date of grant that should have been expensed under APB 25. By failing to record compensation charges for the in-the-money portions of the backdated grants from 1999 to 2006, Microtune's financial statements for 1999 through 2006 were materially impacted. These errors required Microtune to restate its financial results. The impact on Microtune's net income is set forth below.

| Fiscal Year | Net Income (loss) as previously reported: | Net Income (loss) as restated: | Amount Income Overstated/Amount Income Understated | Percentage Income Overstated/(Percentage Loss Understated): |
|---|---|---|---|---|
| 1999 | (8,508,000) | (8,740,000) | 232,000 | (2.65%) |
| 2000 | (31,794,000) | (32,671,000) | 877,000 | (2.68%) |
| 2001 | (67,219,000) | (68,508,000) | 1,289,000 | (1.88%) |
| 2002 | (182,862,000) | (186,631,000) | 3,769,000 | (2.02% / 5.10%) |
| 2003 | (50,340,000) | (51,523,000) | 1,183,000 | (2.30%) |
| 2004 | 5,529,000 | 4,790,000 | 739,000 | 15.43% |
| 2005 | (1,791,000) | (2,438,000) | 647,000 | (26.54%) |
| 2006 | (283,000) | (364,000) | 81,000[1] | (22.25%) |
| Total | $(337,268,000) | $(346,085,000) | 8,817,000 | 2.63% |

---

[1] The options backdating had an additional $284,000 impact on Microtune's Income (Loss) for 2006. This additional $284,000 impact on Income (Loss) was discovered by Microtune's internal investigation (discussed in paragraphs 132 to 135 below) before Microtune reported its 2Q06 earnings and, therefore, was never erroneously reported and never had to be restated.

86.    Thus, the backdated options implemented by Bartek and Richardson caused Microtune's aggregate net income to be overstated (or net loss to be understated) by approximately: 2.65% in 1999, 2.68% in 2000, 1.88% in 2001, 2.02% in 2002, 2.30% in 2003, 15.43% in 2004, 26.54% in 2005, and 22.25% in 2006. The backdating scheme also caused Microtune's net loss to be understated by approximately: 7.41% in the first quarter of 2002, 7.35% in the second quarter of 2002, 6.02% in the third quarter of 2002, and 6.84% for the three quarters in the aggregate. If extraordinary, one-time impairment charges impacting goodwill and intangible assets of approximately $109 million are ignored, the unrecognized compensation expense is also material to the 2002 year-end financial statements.

87.    Microtune also elected to disclose separately in its financial statements "stock option compensation" (two line items: one for R&D expense and one for SG&A expense). The impact on Microtune's stock option compensation disclosure is set forth below.

| Fiscal Year | Stock compensation as previously reported: | Stock compensation as restated: | Amount of Restatement | Percentage understated: |
|---|---|---|---|---|
| 1999 | 850,000 | 1,082,000 | 232,000 | 21.44% |
| 2000 | 4,198,000 | 5,075,000 | 877,000 | 17.28% |
| 2001 | 4,074,000 | 5,363,000 | 1,289,000 | 24.04% |
| 2002 | 13,396,000 | 17,165,000 | 3,769,000 | 21.96% |
| 2003 | 4,140,000 | 5,323,000 | 1,183,000 | 22.22% |
| 2004 | 906,000 | 1,645,000 | 739,000 | 44.92% |
| 2005 | 168,000 | 815,000 | 647,000 | 79.39% |
| Total | $27,732,000 | $36,468,000 | 8,736,000 | 23.96% |

88.     Due to the misconduct of Bartek and Richardson, Microtune's Annual Reports on Form 10-K for years 2000, 2001, 2002 and 2003 (and subsequent years prior to the relevant restatement) were false and misleading in that they did not reflect the compensation expense that should have been recorded under APB 25. Microtune properly disclosed in certain of such filings that:

> Under APB 25, no compensation expense is recorded when the exercise price of the company's employee stock options equals the fair value of the underlying stock on the date of grant. Compensation equal to the intrinsic value of employee stock options is recorded when the exercise price of the stock options is less than the fair value of the underlying stock on the date of grant.

89.     In fact, Microtune disclosed deferred compensation expense incurred during 2000, 2001 and 2002 as a result of "granting stock options with deemed exercise prices below the estimated fair value per share of the company's common stock at the date of grant and as a result of the Transilica acquisition." Due to Bartek and Richardson, Microtune greatly understated deferred stock option compensation expense, however, because it failed to include compensation expense for the in-the-money options granted in connection with the option backdating scheme.

90. Microtune also incorporated certain false statements from its proxy statements into the Forms 10-K signed by Bartek and Richardson. For example, Microtune's proxy statement filed on March 22, 2001, falsely stated that options granted to employees and directors during 2000 "were granted at exercise prices equal to the fair market value of Microtune common stock as determined by the company's Board of Directors on the date of grant."

91. Due to Bartek and Richardson, Microtune's proxy statement filed on March 13, 2002, included the same false statement that employee and director options were granted at exercise prices equal to the fair market value of Microtune common stock.

92. In its proxy statement filed on September 17, 2003, Microtune modified its disclosure to reflect the company's practice of using the closing price on the day before the putative date of grant. Due to Bartek and Richardson, the company falsely disclosed that options granted to named executive officers during fiscal 2002 "have an exercise price equal to the closing price on the date before the grant."

93. Microtune's most highly compensated officers, including Bartek and Richardson, received additional compensation and benefits from the backdating scheme that were not disclosed in Microtune's Forms 10-K and proxy statements. Specifically, due to Bartek and Richardson, Microtune failed to disclose in its proxy statements and Forms 10-K for 2000, 2001, and 2002 (and subsequent years through the date of the restatement) the compensation associated with the in-the-money options received by its most highly paid executives.

94. Due to Bartek and Richardson, Microtune's registration statements that became effective between August 4, 2000 and December 19, 2001 included and/or incorporated by reference the misleading financial statements as well as the fraudulent misrepresentations contained in Microtune's Forms 10-K, 10-Q, and proxy statements. These registration

statements include Forms S-3 filed on October 10, 2000, December 5, 2001 and December 19, 2001, and Forms S-8 filed on February 13, 2001 and December 7, 2001.

95.     Bartek signed the Forms 10-K and registration statements for the years 1998 through 2001 containing the materially misstated financial statements, and certified a Form 10-Q for the third quarter of 2002 under Section 304 of the Sarbanes-Oxley Act of 2002. As Chairman of Microtune's board, Bartek also signed the letter to shareholders and the proxy statement (on behalf of the full board) for the proxies filed in 2001 and 2002, and in 2001 was one of the proxies appointed in connection with the proxy solicitation.

96.     Bartek did not sign Microtune's Form 10-K for fiscal 2002, which was filed on July 31, 2003 – just one month after Bartek's forced resignation. But his conduct during 2002 and prior years caused the 2002 filings to be materially false and misleading.

97.     During fiscal year 2002, Bartek orchestrated the backdating of options. Moreover, he, and others acting at his direction, backdated and falsified documents to conceal the scheme and Bartek's role in it from Microtune's accounting personnel, audit committee and external auditors.   The entire fiscal 2002 backdating misconduct occurred while Bartek was serving as the chief executive officer and chairman of the Board of the company.

98.     Bartek also played a key role in reviewing and drafting the 2002 Form 10-K. Bartek was very active in the 2002 10-K review process until his departure from the Company in June 2003. He participated in drafting sessions and was involved in the discussions with external auditors.

99.     Bartek was also fully aware of the undisclosed compensation expense related to the backdating scheme and therefore knew that Microtune's 2002 10-K and proxy statement

would include materially false and misleading financial statements and other stock option compensation disclosures.

100.    Bartek asserted his Fifth Amendment privilege against self incrimination and refused to answer any and all questions posed by the Commission staff during testimony under a validly issued subpoena.

101.    Richardson's actions led Microtune to file materially false and misleading financial statements. Richardson, as general counsel and later as chief financial officer, played a central role in the backdating scheme. She knew that Bartek routinely engaged in look-backs to pick low stock prices for option grants using historical stock performance information.

102.    Even though she understood the applicable accounting rules, she drafted backdated stock option consents and was responsible for securing the backdated signatures of the Compensation Committee. These backdated consents created the false appearance that the "as of" dates were the actual dates on which the option grants were approved by the Compensation Committee.

103.    But, in fact, as Richardson well knew, those dates did not reflect the date on which the Compensation Committee took action, but rather had been selected with the benefit of hindsight to take advantage of substantially lower stock prices. Further, Richardson knew, or was reckless in not knowing, that the fair market value of the stock on the day she drafted the backdated consents was not the price stated on the consents (rather, the options were substantially in the money).

104.    Despite her awareness of and substantial involvement in the backdating scheme, Richardson reviewed, signed and certified Microtune Commission filings and proxies which she knew, or was severely reckless in not knowing, contained false and materially misleading

statements related to the company's stock option grants. As CFO, she signed the Forms 10-Q and 10-K for the periods ended June 30, 2002, September 30, 2002, December 31, 2002, March 31, 2003 and June 30, 2003.

105. She also signed a false APB 25 checklist and false Sarbanes-Oxley certifications filed with the Form 10-Q for the third quarter of 2002 and the 2002 Annual Report on Form 10-K. In addition, she signed an amended S-3 registration statement filed on December 23, 2002. Richardson also signed the notice of annual meeting that accompanied the proxies filed in 2002 and 2003, and in 2003 was one of the proxies appointed in connection with the proxy solicitation.

106. Bartek and Richardson knew, or were severely reckless in not knowing, that the financial statements and other stock option disclosures contained in the company's Forms 10-K and 10-Q, and the relevant registration statements and proxy statements that each prepared, reviewed, signed and/or certified contained materially false and misleading statements and disclosures regarding employee stock options and compensation expense associated with the options.

107. As a result of the misconduct of Bartek and Richardson, Microtune's books and records falsely and inaccurately reflected, among other things, the dates of option grants, the Company's stock-based compensation expenses, and the Company's financial condition.

108. Additionally, Bartek and Richardson knowingly or recklessly circumvented Microtune's then existing accounting controls by, among other things, backdating unanimous written consents and Actions of the CEO granting stock options and other relevant documents. Bartek and Richardson also failed to maintain a system of internal accounting controls sufficient

to provide assurances that stock option grants were recorded as necessary to permit the proper preparation of financial statements in conformity with GAAP.

**H.    False Certifications**

109.    Under Sarbanes-Oxley Section 302, Bartek and Richardson certified the Form 10-Q for the quarter ended September 30, 2002.  Richardson also certified the Form 10-K for the year-ended 2002, as well as the Forms 10-Q for the first and second quarters of 2003.  In such filings, Bartek and Richardson falsely certified that the reports did not contain any material misstatements or omit material information and that the reports fairly presented in all material respects Microtune's financial condition and results of operations.

110.    Their Sarbanes-Oxley Section 302 certifications also falsely stated that each of them had disclosed to the company's audit committee and its auditors all instances of fraud, whether or not material, involving management or others with responsibility over the company's internal controls.  Bartek and Richardson knew, or were severely reckless in not knowing, that these certifications were wrong.

**I.    Misrepresentations to and Concealment of Key Information From Auditors**

111.    Bartek and Richardson falsely attested in management representation letters to E&Y, Microtune's external auditor, that Microtune's financial statements were prepared in accordance with GAAP.  Both knew, or were severely reckless in not knowing, that the financial statements contained false and misleading statements and omissions.

112.    Bartek and Richardson each also knew that compensation expense was understated due to the backdating scheme, but failed to disclose that fact to the company's external auditors.  They also falsely represented that there had been no fraud involving management or employees who have significant roles in internal controls.

113.   As CEO, Bartek signed representation letters from 1999 through his forced resignation from the company in 2003.  In one such letter dated January 24, 2001, Bartek falsely attested that: "The fair value of common stock used in the granting of stock options is the Board of Director's best estimate of the fair market value of the company's common stock at the date of grant."

114.   Richardson signed false representation letters from April 2002 (after she became the CFO) until her departure in 2003.  In connection with E&Y's 2002 year-end audit, Richardson also completed and signed an Ernst & Young LLP Stock Compensation Review Checklist (APB Opinion No. 25) that also included false representations regarding stock options. Richardson also provided false and misleading information to E&Y regarding the nature of the option re-pricing (e.g., the November 29, 2001 cancellation and re-grant) transactions.

115.   As a consequence of Richardson's preparing written Actions of the CEO, Compensation Committee consents and other documents including false stock option grant dates, Microtune provided false and inaccurate documentation to the Company's external auditors in connection with audits of Microtune's financial statements.  Both Bartek and Richardson were aware that documents bearing falsified grant dates were provided to E&Y.  Further, they each understood that E&Y relied on those falsified documents in conducting its audits and reviews of Microtune's financial statements and public disclosures.

**J.    Defendants Bartek and Richardson Went to Great Lengths to Conceal the Backdating Scheme**

116.   In addition to and including the concealment conduct described in the preceding paragraphs, defendants Bartek and Richardson took affirmative steps that were intended to and did result in the concealment of their fraudulent stock option backdating scheme.  Further, the backdating scheme was by its very nature self-concealing.  As a result, the Commission and its

staff had no notice or reason to conclude that Microtune, through Bartek and Richardson, was conducting and concealing a massive stock option backdating fraud.

117.    Bartek and Richardson each prepared, reviewed and executed false public filings over a period of years, during which the Commission had no notice or reason to conclude they were conducting and concealing a massive fraud. They took affirmative steps to conceal their backdating actions by authorizing, executing or otherwise causing Microtune to issue public filings, including proxy statements; Forms 10-K, 10-Q, 3, 4, and 5; and other Commission filings and public statements that contained false and misleading disclosures regarding the grant dates of Microtune stock options and the required compensation expense related to such grants.

118.    Further, as noted above, Bartek and Richardson concealed the granting of in-the-money options and key evidence thereof from Microtune's auditors. They prepared or signed backdated written consents authorizing stock options, and caused Microtune employees to falsify internal books and records. The Commission and its staff were entitled to rely upon the truthfulness of the disclosures contained in Microtune's public statements and SEC filings.

119.    As described above, the Yahoo! historic price charts used by Bartek to select advantageous grant dates and the corresponding low stock option exercise prices provide overwhelming evidence of stock option backdating. Bartek's assistant dutifully maintained copies of the Yahoo! price charts in the company's minute books until they were discovered by Richardson, who personally removed this key evidence of backdating from Microtune's minute books.

120.    Richardson also instructed the Microtune legal team and Bartek's assistant to remove Yahoo! historic price charts, e-mails and other backup support from the company's minute books. Due to Richardson's conduct, this key evidence of backdating was not provided

to E&Y during the accounting firm's annual audits and quarterly reviews, thereby allowing the stock option backdating scheme to proceed unabated and unchecked.

121. In addition, during testimony taken on February 11, 2004 in connection with a prior SEC revenue recognition investigation, Bartek provided intentionally false and misleading testimony to the Commission staff when asked if he was backdating stock options. Although backdating was not the subject of the prior investigation (which related to another fraud conducted by Microtune on Bartek's watch), the staff had been prompted to inquire about potential backdating by the June 26, 2001 e-mail to Microtune's then president in which Bartek stated:

> [The employees] will be pleased with the [option] price. [Bartek's assistant] pulled some tricks on timing, and we are documenting that this grant was done on May 2, and therefore the closing price on May 1 is the option price: $12.35. So, they're already almost $8 in-the-money!

The staff did not receive a copy of this e-mail until, at the earliest, August 2003, when the staff first requested documents in connection with its investigation into potential fraudulent revenue recognition at Microtune.

122. When specifically asked during his February 11, 2004 testimony if he was backdating stock options, Bartek attempted to explain away his June 26, 2001 e-mail by testifying that "I don't think that was the case. I think there was just a delay in paperwork of documenting some of these."

123. Bartek went on to testify that "I don't remember any tricks being pulled on timing. These were all — there would have been documented records that they were approved by any kind of compensation committee, if that was appropriate, on the certain dates."

124. Given the pervasive nature of the backdating at Microtune, and his own intimate involvement in it, Bartek knew that his answers were false and misleading. Bartek's false

exculpatory statements had the intended effect of concealing the stock option backdating scheme.

125.    Based on the foregoing, Bartek and Richardson deprived the Commission and the public of notice or reason to conclude that they were conducting a fraudulent stock option backdating scheme.  Further, the Commission exercised due diligence until discovering the backdating scheme on or about on July 27, 2006, when Microtune publicly announced that its audit committee had commenced an internal review of the company's stock option grant practices.

126.    Within weeks of this initial public disclosure of backdating practices at Microtune, the Commission staff opened an informal inquiry into Microtune's option granting practices.  After conducting a thorough and timely investigation, the Commission authorized the filing of this complaint.

**K.      Bartek and Richardson Were Motivated By Personal Gain**

127.    The backdating scheme conferred on each of the individual defendants substantial hidden benefits.  Bartek and Richardson were each able to obtain improperly millions of dollars in potential profit (*i.e.*, paper gains) as a result of the in-the-money options that they received.

128.    Richardson exercised some of her backdated options and reaped tangible financial benefits from the fraud.  She profited by an in-the-money amount of at least hundreds of thousands of dollars as a result of the fraudulently low exercise prices attached to her backdated options.  Thus, each defendant was unjustly enriched through their fraudulent backdating scheme.

## L.   The Internal Investigation and Ensuing Restatement

129.   On July 27, 2006, Microtune disclosed for the first time that it was conducting an internal investigation into its prior option grant practices covering the time from Microtune's initial public offering in August 2000 through June 2006.

130.   On November 1, 2006, Microtune announced that its audit committee had concluded that:

> The actual measurement dates for certain past stock option grants differed from the measurement dates previously used in accounting for such grants. Because, in certain cases, the prices on the previously used measurement dates were lower than the prices on the actual accounting measurement dates, we determined that we should have recognized *material* amounts of stock-based compensation expense in connection with these transactions. Therefore, we concluded that our previously filed unaudited interim and audited annual consolidated financial statements for the years ended December 31, 2005, 2004, 2003, 2002 and 2001, as well as the unaudited interim financial statements for the first quarter ended March 31, 2006, should no longer be relied upon because these financial statements contained misstatements and would need to be restated. We disclosed this conclusion in our Current Report on Form 8-K, filed with the SEC on November 1, 2006.

131.   On January 22, 2007, Microtune filed its restated financial statements for the company's "consolidated financial statements for the years ended December 31, 2005, 2004, and 2003, and the selected consolidated financial data as of and for the years ended December 31, 2005, 2004, 2003, 2002, 2001, 2000 and 1999 to correctly account for," among other things, "improper measurement dates for stock option grants," including those relating to the backdating scheme described in this complaint.

132.   In its restated financial statements, Microtune went on to disclose that:

> [O]ur Audit Committee, which consists solely of independent directors, self-initiated an investigation into our stock option grant practices. As a result of this investigation, we have identified errors with an aggregate financial impact of approximately $9.1 million. In the table above describing the financial impact of the Audit Committee's findings on our restated consolidated financial statements, we have summarized the aggregate financial impact of the errors into five categories as further described in the table. Certain amounts reflected in the table

are the result of errors from earlier periods due to the accounting treatment for such errors that requires the amortization of the errors over multiple periods. For example, only approximately $1.0 million of the $9.1 million adjustment resulted from errors in periods after August 12, 2003, the date of the appointment of Mr. James A. Fontaine as CEO; however, approximately $2.0 million of the adjustment actually impacts our financial results after August 12, 2003. As a result of the Audit Committee's investigation, we have determined the following:

*Inappropriate Practices Prior to August 12, 2003.* The Audit Committee has identified the following inappropriate practices, each of which occurred prior to the appointment of Mr. Fontaine [as new CEO] on August 12, 2003:

- We followed a regular practice of backdating stock option grants to each new employee to the date corresponding to the lowest closing stock price during approximately a one to two week period after such new employee's start date. Once a favorable price was selected, other (non-new employee) grants planned during the same timeframe were also generally dated with the date selected to take advantage of the low exercise price. Grants of this type consisted of approximately 1.0 million stock options and involved a large number of individual granting actions. The total financial impact of these errors account for less than $0.4 million of the Category 1 adjustment. New measurement date determinations for this category were generally based on documentation in the corporate minute books indicating when listings of stock prices for a range of dates were printed and/or electronic date stamping showing when the granting action documentation was prepared. The Audit Committee concluded that granting actions were signed on the same date the stock price range page was printed, leading us to conclude that this was the most likely measurement date.

- On several occasions, in order to select favorable exercise prices for certain newly-hired executives or other senior personnel, we created employment records to establish start dates (and grant dates) that preceded the date they actually began working for us. We do not currently employ any person who benefited from this practice. The total financial impact of these errors, included in the Category 1 adjustment, was approximately $1.2 million and consists of three instances involving four individuals who received an aggregate of 580,000 stock options. For two of these instances, which involved three individuals, the actual start dates were determined to be later than the stated start and grant dates through an examination of the employees' personnel or payroll files and through a review of e-mail messages dated weeks after the stated start and grant dates, describing the intent of prior senior management to create fictitious start dates for these employees such that favorable exercise prices could be selected. Both of these grants were approved by unanimous written consent, or UWC, with "effective dates" that preceded the date that they were actually signed. Based on an analysis of electronic date stamping

information and an examination of the original documentation, we have concluded that the UWC was actually signed on the date of the Compensation Committee meeting and have determined that such date is the most likely measurement date for these grants. The total financial impact of errors for these instances was approximately $1.0 million. For the other instance, which involved one individual, the approval of the grant did not occur until several weeks after the stated grant date. This grant was also approved by a UWC with an "effective date" that preceded the date the UWC was actually signed. We determined the measurement date for this grant to be the date that final approval was received from the Compensation Committee as evidenced by the receipt of an electronic signature page and supporting electronic date stamping evidence. The total financial impact of this error for this grant was approximately $0.2 million.

- We backdated certain other stock option grants by selecting a grant date and corresponding exercise price that preceded the date that we actually determined to make such grants. In some cases, these stock option grants were backdated by several months. The total financial impact of these errors was approximately $4.2 million and is included in the Category 1 adjustment. For example, on one occasion, for a grant to eleven members of management totaling 439,000 stock options, the approval of the grant did not occur until several weeks after the stated grant date. This grant was approved by a UWC of our Compensation Committee with an "effective date" that preceded the date the UWC was actually signed. We determined the measurement date for this grant to be the date that final approval was received from the Compensation Committee as evidenced by receipt of an electronic signature page and supporting electronic date stamping evidence. The total financial impact for this single error was approximately $2.2 million. On another occasion, for a grant to five members of management totaling 490,000 stock options, the approval of the grant did not occur until several weeks after the stated grant date. This grant was approved by a UWC with an "effective date" that preceded the date the UWC was actually signed. Based on an analysis of electronic date stamping and an examination of original documentation, we have concluded that the UWC was actually signed on the date of the Compensation Committee meeting and that such date is the most likely measurement date for this grant. The total financial impact of this error was approximately $0.7 million and is included in the Category 1 adjustment.

- In two instances involving a large number of employees, stock options were granted and subsequently regranted using a lower exercise price. The re-grant was not properly accounted for using variable accounting. The total financial impact for these errors was $0.1 million and is included in the Category 1 adjustment. . . .

133.    Microtune's restatement constituted an admission of accounting errors.  GAAP provides that "correction of an error in the financial statements of a prior period discovered subsequent to their issuance should be reported as a prior period adjustment."  Accounting Principles Board ("APB") Opinion No. 20.36 (1971).  An error includes a mistake in the application of GAAP as well as a misuse of facts.  As the APB explains:

> Errors in financial statements result from mathematical mistakes, mistakes in the application of accounting principles, or oversight or misuse of facts that existed at the time the financial statements were prepared.  In contrast, a change in accounting estimate results from new information or subsequent developments and accordingly from better insight or improved judgment. . . . A change from an accounting principle that is not generally accepted to one that is generally accepted is a correction of an error for purposes of applying this Opinion.

APB Opinion No. 20.13 (1971).

134.    The Commission, in accordance with its rulemaking authority under the Exchange Act, imposes affirmative obligations upon issuers to disclose specific information in periodic reports which must be filed with the Commission.  15 U.S.C. 78m.  One such obligation, imposed by Commission Regulation S-X, requires issuers to file financial statements that comply with GAAP and are audited in accordance with GAAS.  See 17 C.F.R. 210.2-02 & 210.4-01. Under SEC Regulation S-X, "financial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate, despite footnote or other disclosures, unless the Commission has otherwise provided." *17 C.F.R. § 210.4-01(a)(1)*.  Consequently, Microtune was required by law to correct the errors in its previously filed financial statements.

## FIRST CLAIM

### *(Violations of Exchange Act Section 10(b) and Exchange Act Rule 10b-5)*

135.    The Commission realleges paragraphs 1 through 134.

136.    By engaging in the conduct described above, Microtune, Bartek, and Richardson, with scienter, directly or indirectly, by use of the means or instruments of interstate commerce or of the mails, or of the facility of a national securities exchange, in connection with the purchase or sale of securities: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities..

137.    By reason of the foregoing, Microtune, Bartek, and Richardson violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

138.    Bartek also knowingly provided substantial assistance to Microtune's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

139.    By reason of the foregoing, Bartek has aided and abetted Microtune's violations, and unless restrained and enjoined will continue to aid and abet such violations, of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

140.    Richardson also knowingly provided substantial assistance to Microtune's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

141.    By reason of the foregoing, Richardson has aided and abetted Microtune's and Bartek's violations, and unless restrained and enjoined will continue to aid and abet such

violations, of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM

### *(Violations of Securities Act Section 17(a)(1))*

142.    The Commission realleges paragraphs 1 through 134.

143.    By engaging in the conduct described above, Microtune, Bartek, and Richardson, directly or indirectly, by use of the means or instruments of interstate commerce or of the mails, in connection with the offer or sale of securities, with scienter, employed devices, schemes or artifices to defraud.

144.    By reason of the foregoing, Microtune, Bartek, and Richardson violated Section 17(a)(1) of the Securities Act [15 U.S.C. §§ 77q(a)(1)].

## THIRD CLAIM

### *(Violations of Securities Act Sections 17(a)(2) and 17(a)(3))*

145.    The Commission realleges paragraphs 1 through 134.

146.    Microtune, Bartek, and Richardson, directly or indirectly, by use of the means or instruments of interstate commerce or of the mails, in connection with the offer or sale of securities, and with negligence: (a) obtained money or property by means of untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (b) engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon purchasers of Microtune securities.

147.    By reason of the foregoing, Microtune, Bartek and Richardson violated Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and (3)].

## FOURTH CLAIM

### *(Violations of Exchange Act 13(b)(5) and Exchange Act Rule 13b2-1)*

148.    The Commission realleges paragraphs 1 through 134.

149.    By engaging in the conduct described above, Bartek and Richardson, directly or indirectly, knowingly falsified books, records, or accounts of Microtune, or knowingly circumvented or knowingly failed to implement a system of internal accounting controls at Microtune subject to Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

150.    By engaging in the conduct described above, Bartek and Richardson, directly or indirectly, falsified or caused to be falsified, books, records, or accounts subject to 15 U.S.C. § 78m(b)(2)(A).

151.    By reason of the foregoing, Bartek and Richardson violated, and unless restrained and enjoined will continue to violate Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1].

## FIFTH CLAIM

### *(Violations of Exchange Act Rule 13b2-2)*

152.    The Commission realleges paragraphs 1 through 134.

153.    Bartek and Richardson, each as an officer of an issuer, by engaging in the conduct described above, directly or indirectly, made or caused to be made a materially false or misleading statement to an accountant, or omitted to state or caused another person to omit to state any material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with: (i) an audit, review or examination of the financial statements of an issuer required to be made under Commission rules, or (ii) the preparation or filing of any document or report required to be filed with the Commission; or directly or indirectly took action, or directed another to take

action, to coerce, manipulate, mislead, or fraudulently influence any independent public or certified public accountant engaged in the performance of an audit or review of the financial statements of Microtune required to be filed with the Commission, while they each knew or should have known that such action(s), if successful, could result in rendering Microtune's financial statements materially misleading.

154. By reason of the foregoing, Bartek and Richardson have violated, and unless restrained and enjoined will continue to violate, Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

## SIXTH CLAIM

### *(Violations of Exchange Act Rule 13a-14)*

155. The Commission realleges paragraphs 1 through 134.

156. Bartek and Richardson signed, as Microtune's principal executive officer and principal financial officer, respectively, signed false certifications under Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rule 13a-14 thereunder that were included in Microtune's annual and quarterly reports. Bartek signed a false certification that was included with Microtune's quarterly report filed on Form 10-Q for the quarter ended September 30, 2002. Richardson signed false certifications that were included with Microtune's 2002 annual report filed on Form 10-K, as well as its quarterly reports filed on Forms 10-Q for the quarters ended September 30, 2002, March 31, 2003, and June 30, 2003. In each such certification, Bartek and Richardson falsely stated, among other things, that: (a) each report did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading; (b) each financial statement, and other financial information included in each report, fairly presented in all material respects the financial condition, results of operations, and cash flows of

Microtune as of, and for, the period presented in the report; and (c) Bartek and Richardson had disclosed to Microtune's auditors all significant deficiencies in the design or operation of Microtune's internal controls and any fraud, whether or not material, that involved management or other employees who had a significant role in Microtune's internal controls. Each knew or should have known that their respective certifications were false.

157.   By reason of the foregoing, Bartek and Richardson violated Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14].

**SEVENTH CLAIM**

*(Violations of Exchange Act Section 14(a) and
Exchange Act Rules 14a-3 and 14a-9)*

158.   The Commission realleges paragraphs 1 through 134.

159.   Microtune, Bartek, and Richardson, directly or indirectly, by use of the means or instruments of interstate commerce or of the mails, or of the facility of a national securities exchange, knowingly, recklessly or negligently solicited proxies by means of a proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing statements which, at the time and in light of the circumstances under which they were made, were false and misleading with respect to material facts, or which omitted to state material facts which were necessary in order to make the statements made not false or misleading or which were necessary to correct statements in earlier false or misleading communications with respect to the solicitation of proxies for the same meeting or subject matter.

160.   By engaging in the conduct described above, Microtune, Bartek, and Richardson, violated Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Exchange Act Rules 14a-3 and 14a-9 [17 C.F.R. § 240.14a-3; 17 C.F.R. § 240.14a-9].

161.    Bartek and Richardson also knowingly provided substantial assistance to Microtune's violations of Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Exchange Act Rule 14a-9 [17 C.F.R. § 240.14a-9].

162.    By reason of the foregoing, Bartek and Richardson aided and abetted Microtune's violations, and unless restrained and enjoined will continue to aid and abet such violations, of Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Exchange Act Rule 14a-9 [17 C.F.R. § 240.14a-9].

## **EIGHTH CLAIM**

### *Violations of Exchange Act Section 13(a) and Exchange Act Rules 12b-20, 13a-1 and 13a-13)*

163.    The Commission realleges paragraphs 1 through 134.

164.    Microtune filed with the Commission and disseminated to investors false and misleading quarterly and annual reports.  In doing so, Microtune violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)], and Exchange Act Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13], which require issuers of securities registered under the Exchange Act to file with the Commission factually accurate quarterly and annual reports that, among other things, do not contain untrue statements of material fact or omit to state material information necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

165.    By engaging in the conduct described above, Bartek and Richardson knowingly or with severe recklessness gave substantial assistance to Microtune's violations of these provisions.

166.    By reason of the foregoing, Bartek and Richardson have aided and abetted Microtune's violations, and unless restrained and enjoined will continue to aid and abet such or

similar violations, of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)], and Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13].

## NINTH CLAIM

### *(Violations of Exchange Act Sections 13(b)(2)(A) and 13(b)(2)(B))*

167.    The Commission realleges paragraphs 1 through 134.

168.    Based on the conduct alleged above, Microtune violated Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)], which requires issuers of securities registered under Section 12 of the Exchange Act [15 U.S.C. § 78l] to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of its assets.

169.    Based on the conduct alleged above, Microtune violated Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)], which requires issuers to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain the accountability of assets.

170.    By engaging in the conduct described above, Bartek and Richardson knowingly or recklessly provided substantial assistance to Microtune in (i) its failure to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of the assets of Microtune; and (ii) its failure to devise and maintain a sufficient system of internal accounting controls.

171.    By reason of the foregoing, Microtune has violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78(m)(b)(2)(B)].

172.    By reason of the foregoing, Bartek and Richardson have aided and abetted Microtune's violations, and unless restrained and enjoined will continue to aid and abet such

violations, of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78(m)(b)(2)(B)].

## **REQUEST FOR RELIEF**

173. For these reasons, the Commission respectfully requests that the Court:

### **I.**

Permanently enjoin Microtune from violating Sections Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B) and 14(a) of the Exchange Act [15 U.S.C. §§ 78j(b), 78(m)(b)(2)(A) and 78(m)(b)(2)(B)], and Exchange Act Rules 10b-5, 12b-20, 13a-1, 13a-13, and 14a-9 [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, 240.13a-13, and 240.14a-9];

### **II.**

Permanently enjoin Bartek from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Sections 10(b), 13(b)(5), and 14(a) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(b)(5) and 78n(a)], and Exchange Act Rules 10b-5, 13a-14, 13b2-1, 13b2-2, 14a-3 and 14a-9 [17 C.F.R. §§ 240.10b-5, 240.13a-14, 240.13b2-1, 240.13b2-2, 240.14a-3 and 240.14a-9], and aiding and abetting violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78(m)(b)(2)(A), and 78(m)(b)(2)(B)] and Exchange Act Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13].

### **III.**

Permanently enjoin Richardson from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Sections 10(b), 13(b)(5), and 14(a) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(b)(5) and 78n(a)], and Exchange Act Rules 10b-5, 13a-14, 13b2-1, 13b2-2, 14a-3, and 14a-9 [17 C.F.R. §§ 240.10b-5, 240.13a-14, 240.13b2-1, 240.13b2-2, 240.14a-3, and 240.14a-9], and aiding and abetting violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange

Act [15 U.S.C. §§ 78m(a), 78(m)(b)(2)(A), and 78(m)(b)(2)(B)] and Exchange Act Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13].

## IV.

Order defendants Bartek and Richardson to disgorge all wrongfully obtained funds and benefits, plus prejudgment interest.

## V.

Order defendants Bartek and Richardson to pay civil monetary penalties under Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act [15 U.S.C. §§ 77t(d) and 78u(d)(3)];

## VI.

Bar defendants Bartek and Richardson from serving as officers or directors of any public company under Section 20(e) of the Securities Act [15 U.S.C. §§ 77t(e)] and Section 21(d)(2) of the Exchange Act [ and 78u(d)(2)]; and

## VII.

Issue an order directing defendants Bartek and Richardson to repay bonuses and stock profits, under Section 304 of the Sarbanes-Oxley Act of 2002 [15 U.S.C. § 7243].

## VIII.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## IX.

Enter an Order of Final Judgment as to defendant Microtune in the form submitted simultaneously with the filing of the accompanying motion for entry of final judgment.

## X.

Order any additional relief as this Court may determine just and necessary.

Dated: June 30, 2008

Respectfully submitted,

Toby M. Galloway
Texas Bar No. 00790733
David Reece
Texas Bar No. 24002810
Michael D. King
Texas Bar No. 24032634
D. Thomas Keltner
Texas Bar No. 24007474
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
801 Cherry Street, 19th Floor
Fort Worth, TX 76102
E-mail: GallowayT@sec.gov
Phone: (817) 978-6447 (Galloway)
Fax: (817) 978-2700

ORIGINAL

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I.(a) PLAINTIFF**

SECURITIES AND EXCHANGE COMMISSION

**MICROTUNE, INC., DOUGLAS J. BARTEK, and NANCY RICHARDSON, CPA, Defendants.**

3-08CV1105-B

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant: Dallas
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEY (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

TOBY M. GALLOWAY
SECURITIES AND EXCHANGE COMMISSION
801 Cherry Street, Suite 1900
Fort Worth, TX 76102
(817) 978-6447

ATTORNEYS (IF KNOWN)

RECEIVED
JUN 30 2008
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

**II. BASIS OF JURISDICTION** (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question (U.S. Government Not a Party)
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (For Diversity Cases Only)
(PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (PLACE AN "X" IN ONE BOX ONLY)

**CONTRACT**
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability

**TORTS**

*PERSONAL INJURY*
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury

*PERSONAL INJURY*
☐ 362 Personal Injury - Med. Malpractice
☐ 365 Personal Injury - Product Liability
☐ 368 Asbestos Personal Injury Product Liability

*PERSONAL PROPERTY*
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**FORFEITURE/PENALTY**
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 R.R. & Truck
☐ 650 Airline Regs.
☐ 660 Occupational Safety/Health
☐ 690 Other

**LABOR**
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt. Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

**BANKRUPTCY**
☐ 422 Appeal 28 USC 156
☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**SOCIAL SECURITY**
☐ 861 HIA (1395FF)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS - Third Party 26 USC 7609

**OTHER STATUTES**
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 810 Selective Service
☒ 850 Securities/Commodities/Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Information Act
☐ 900 Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions

**REAL PROPERTY**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**CIVIL RIGHTS**
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 444 Welfare
☐ 440 Other Civil Rights

**PRISONER PETITIONS**
☐ 510 Motions to Vacate Sentence
*Habeas Corpus:*
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights

**V. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (Specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judge

**CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.) Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §77q(a)] and Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B), 13(b)(5), and 14(a)), of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B), 78m(b)(5), and 78n(a)], and Rules 10b-5, 12b-20, 13a-1, 13a-13, 13a-14 13b2-1, 13b2-2, 14a-9, and 16a-3 thereunder [17 C.F.R. § 240.10b-5, 240.12b-20, 240.13a-1, 240.13a-13, 240.13a-14, 240.13b2-1, 240.13b2-2, 240.14a-9, and 240.16a-3)].

**VII. REQUESTED IN COMPLAINT:**  CHECK IF THIS IS A CLASS ACTION ☐ UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND ☐ YES  ☒ NO

**VIII. RELATED CASE(S) IF ANY** (See Instructions):

SIGNATURE OF ATTORNEY OF RECORD  _Toby M Galloway_

DATE  6/30/08

**FOR OFFICE USE ONLY**

Receipt # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____