IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION | § § § | |
| Plaintiff, | § § § | NO. 3-08-CV-1105-B |
| VS. | § § | |
| MICROTUNE, INC., ET AL. | § § § | |
| Defendants. | § | |

## **MEMORANDUM OPINION AND ORDER**

In this securities fraud action, Defendants Douglas J. Bartek and Nancy A. Richardson have filed a joint motion to compel compliance with a Rule 45 subpoena served on Andrews Kurth LLP ("Andrews Kurth"), a law firm retained by their former employer, Microtune, Inc. ("Microtune"), to investigate the company's historic stock option practices. Microtune has filed a motion to quash the Andrews Kurth subpoena, as well as subpoenas served on other law firms and consultants who participated in the investigation. For the reasons stated herein, defendants' motion is granted and Microtune's motion is denied.

I.

This discovery dispute arises out of a civil enforcement action brought by the United States Securities and Exchange Commission ("SEC") against Microtune, a publicly traded company headquartered in Plano, Texas, and two of its former officers--Douglas J. Bartek and Nancy A. Richardson. (*See* Plf. Am. Compl. at 1, ¶ 1). Bartek is the former Chief Executive Officer of Microtune. (*See id.* at 7, ¶ 21). Richardson served as the company's Chief Financial Officer and General Counsel. (*See id.* at 8, ¶ 23). Succinctly stated, the SEC contends that Microtune, through

Bartek and Richardson, engaged in a fraudulent stock option backdating scheme designed to provide executives and other employees with valuable "in-the-money" options without recording the required compensation expense in the company's books, records, and financial statements. (*See* Plf. Compl. at 1, ¶ 1).[1] As a result of this backdating scheme, Microtune materially understated its expenses and materially overstated its income in various SEC filings. (*Id.* at 3-4, ¶ 8).

In June 2006, amid extensive press coverage of alleged improprieties with the stock option granting practices of other public companies, certain members of Microtune's current management found evidence of intentional stock option backdating and reported their findings to the Audit Committee. (*See* Microtune Mot. App. at A2, ¶ 3; *see also* Def. Mot. App. at 6). The Audit Committee responded by initiating an internal investigation of the company's stock option practices

---

[1] One federal district court described the practice of stock option backdating as follows:

> A company grants stock options to its employees at a certain exercise price. This gives the employee the right to purchase the stock at the exercise price at a later date after the option vests. If the stock price rises, the employee stands to make a profit. If the stock price falls below the exercise price, the option is worthless to the employee. Options where the exercise price is at the market price as of the date of the grant are referred to as "at-the-money" options. Options where the exercise price is lower than the market price as of the grant date are referred to as "in-the-money" options. For financial reporting purposes, companies are required to record compensation costs for granting in-the-money options because the company effectively receives a lower price than it could get for the shares on the open market. No compensation costs need be recorded for at-the-money options because the exercise price is the same as the market price. The company is not foregoing any revenue. Because they are so closely tied with the company's stock price, and in turn the company's fortunes, stock options have been considered by some to be an important part of incentive-based compensation.
>
> Backdating occurs when the option's grant date is altered to an earlier date with a lower, more favorable price to the recipient. The option price is normally the market price as of the grant date. If the option's price is below the price on the market as of the grant date, the company has to recognize the difference between the two as a compensation expense. If the option's price is at or above the price on the market at the grant date, the company recognizes no compensation expense. For options backdated to a lower price, the proper accounting is to recognize an expense. This, of course, will lower or eliminate the company's earnings for the period of the backdated grants.

*In re CNET Networks, Inc.*, 483 F.Supp.2d 947, 949-50 (N.D. Cal. 2007).

from August 4, 2000, the date of the initial public offering, through June 2006. (*See* Microtune Mot. App. at A2, ¶ 3). On or about July 3, 2006, the Audit Committee specially retained the Andrews Kurth law firm to gather facts and offer advice with respect to legal matters related to the company's historic stock option practices. (*Id.* at A3, ¶ 5 & A6, ¶ 2). Andrews Kurth subsequently engaged Grant Thornton LLP ("Grant Thornton"), a forensic accounting firm, to assist with the investigation. (*Id.* at A3, ¶ 5 & A23, ¶ 2; *see also* Def. Mot. App. at 7).

Based on early investigative findings and advice from Andrews Kurth, Microtune informed the SEC of the investigation on or about July 26, 2006. (Microtune Mot. App. at A3, ¶ 4; Def. Mot. App. at 21). The very next day, Microtune publicly announced that the Audit Committee had commenced an internal review of the company's stock option practices. (*See* Plf. Am. Compl. at 42, ¶ 160). Within weeks, the SEC opened an informal inquiry into the matter. (*See id.* at 42, ¶ 161). Throughout the course of its investigation, Andrews Kurth provided periodic updates and reported tentative findings to the SEC. (*See* Def. Mot. App. at 21). Andrews Kurth, on behalf of the Audit Committee, also reported the circumstances under review to the Nasdaq Listing Qualifications Panel so as not to jeopardize the continued listing of the company's common stock on the Nasdaq Global Market. (*Id.* & at 265-93).

On February 13, 2007, Andrews Kurth formally presented the findings of its investigation to the SEC. (Microtune Mot. App. at A4, ¶ 8 & A9, ¶ 14). Among other things, Andrews Kurth reported that Microtune engaged in improper stock option granting and exercise practices prior to August 12, 2003, that Bartek directed the improper practices while he was CEO, and that there was no intentional wrongdoing by the company's current senior management or Board of Directors. (*See* Def. Mot. App. at 27-43, 46). Similar conclusions were reported to the SEC at a second presentation in July 2007. (*See* Microtune Mot. App. at A4, ¶ 8 & A9, ¶ 14). In conjunction with these

presentations, Andrews Kurth provided the SEC with hundreds of pages of documents and other information gathered during the investigation. (*Id.* at A9, ¶ 15). That was in addition to approximately 30,000 pages of materials, including confidential reports, interview memoranda, and investigative working papers, previously produced to the SEC. (*See id.* at A8, ¶ 10 & A34-35; *see also* Def. Mot. App. at 350-51, 469-70, 594-95). Microtune, through its lawyers, also cooperated with the SEC investigation by providing copies of confidential communications between the company and its outside counsel regarding the company's stock option practices. (*See* Microtune Mot. App. at A37-39 & 41-43; *see also* Def. Mot. App. at 597-99).

On June 30, 2008, the SEC filed the instant lawsuit against Microtune, Bartek, and Richardson. Microtune immediately settled with the SEC by agreeing to the entry of a permanent injunction prohibiting any further violations of federal securities laws. Bartek and Richardson remain parties to the action. Shortly after discovery commenced, Bartek and Richardson subpoenaed documents from Microtune, Andrews Kurth, Grant Thornton, and other law firms that provided professional services to the company. Microtune now moves to quash the subpoenas on the grounds that certain documents are protected by the attorney-client privilege and/or the work product doctrine. Bartek and Richardson seek an order enforcing the subpoena issued to Andrews Kurth. The motions have been fully briefed by the parties and are ripe for determination.

## II.

Microtune contends that 510 documents withheld from production by Andrews Kurth, as well an unspecified number of documents subpoenaed from the company and its other lawyers and consultants, constitute privileged attorney-client communications, work product, or both. The court will examine these privileges separately.

A.

The attorney-client privilege serves to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981). This privilege "rests on the need for the advocate and counselor to know all that relates to the client's reasons for seeking representation if the professional mission is to be carried out." *Id.*, 101 S.Ct. at 682, *citing Trammel v. United States*, 445 U.S. 40, 51, 100 S.Ct. 906, 913, 63 L.Ed.2d 186 (1980). While the attorney-client privilege extends to all situations in which counsel is sought on a legal matter, it protects "only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege." *Fisher v. United States*, 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1976). Hence, the privilege does not protect documents and other communications simply because they result from an attorney-client relationship. *See Navigant Consulting, Inc. v. Wilkinson*, 220 F.R.D. 467, 477 (N.D. Tex. 2004) (Kaplan, J.). Moreover, courts generally construe the privilege narrowly because "assertion of privileges inhibits the search for truth." *Id., citing Perkins v. Gregg County*, 891 F.Supp. 361, 363 (E.D. Tex. 1995).

Where, as here, the existence of a federal question provides the basis for federal subject matter jurisdiction, federal common law governs the resolution of the privilege issue. *See United States v. Zolin*, 491 U.S. 554, 562, 109 S.Ct. 2619, 2625, 105 L.Ed.2d 469 (1989), *citing* FED. R. CIV. P. 501. Under federal common law, the elements of the attorney-client privilege are: (1) a confidential communication; (2) made to a lawyer or his subordinate; (3) for the primary purpose of securing either a legal opinion, legal services, or assistance in a legal proceeding. *See United States v. Robinson*, 121 F.3d 971, 974 (5th Cir. 1997), *cert. denied*, 118 S.Ct. 731 (1998). The burden is on the party asserting the privilege to demonstrate how each document satisfies all the

elements of the privilege. *See Navigant Consulting*, 220 F.R.D. at 473, *citing Hodges, Grant & Kaufmann v. United States*, 768 F.2d 719, 721 (5th Cir. 1985). A general allegation of privilege is insufficient to meet this burden. *Id.* Instead, "a clear showing must be made which sets forth the items or categories objected to and the reason for that objection." *Id., quoting Caruso v. Coleman Co.*, No. 93-CV-6733, 1995 WL 384602 at *1 (E.D. Pa. Jun. 22, 1995). The proponent must provide sufficient facts by way of detailed affidavits or other evidence to enable the court to determine whether the privilege exists. *Id.* Although a privilege log and an *in camera* review of documents may assist the court in conducting its analysis, a party asserting the privilege still must provide "a detailed description of the materials in dispute and state specific and precise reasons for their claim of protection from disclosure." *Id.* at 473-74, *quoting Pippenger v. Gruppe*, 883 F.Supp. 1201, 1212 (S.D. Ind. 1994). In fact, "resort to *in camera* review is appropriate only *after* the burdened party has submitted detailed affidavits and other evidence to the extent possible." *Id.* at 474, *quoting Caruso*, 1995 WL 384602 at *1 (emphasis in original).

1.

In its privilege log, Andrews Kurth identifies 66 documents that have been withheld from production as both attorney-client communications and work product materials.[2] However, the only evidence that even remotely implicates the attorney-client privilege is the declaration of J. David Washburn, an Andrews Kurth lawyer who led the firm's investigation into Microtune's stock option practices. According to Washburn:

---

[2] These documents are identified by Andrews Kurth in its privilege log as Docs. 48, 49, 63, 64, 66, 67, 68, 70, 71, 75, 77, 126, 127, 133, 142, 148, 222, 223, 224, 225, 226, 227, 228, 229, 230, 234, 259, 263, 265, 269, 276, 278, 279, 288, 295, 298, 308, 317, 322, 328, 344, 345, 351, 370, 371, 375, 377, 398, 412, 413, 414, 415, 426, 427, 428, 444, 445, 450, 469, 470, 471, 473, 481, 511, 512, 513, 514, and 532. (*See* Microtune Resp. App. at A18-A70). The court recently learned that two of the documents, Docs. 126 and 127, were produced to defendants afer the privilege log was prepared. *See* Ltr. to Court, 5/20/09.

> The Audit Committee of the Board of Directors of Microtune, Inc. ("Microtune" or the "Company") retained the Corporate Compliance, Investigations and Defense Group of AK on or about July 3, 2006 to gather facts and advise the Audit Committee with respect to legal matters in connection with an investigation into the Company's stock options granting practices during the period from August 4, 2000 through June 2006 (the "Investigation Period"). I was one of the partners in charge of the engagement.
>
> At all times during the engagement, AK acted under the direction of the Audit Committee.
>
> AK, in turn, engaged Grant Thornton LLP ("GT") on or about September 12, 2006 to assist with the engagement. At all times during the engagement, GT acted under the direction of the Audit Committee and AK.
>
> * * * *
>
> AK and GT also prepared and assembled various files and documents in order to advise the Audit Committee in connection with the investigation. These files and documents include internal memoranda, analyses, and other working documents of AK and GT regarding the investigation and the legal implications of the investigation's findings. These documents also include confidential communications between AK and the Audit Committee.

(Microtune Mot. App. at A6-A8, ¶¶ 2-4, 13). Similar testimony is provided by Anthony J. LeVecchio, Chair of the Microtune Audit Committee. (*See id.* at A2-A4). While these declarations provide background information about the Audit Committee's internal investigation and the involvement of Andrews Kurth and Grant Thornton, neither Washburn nor LeVecchio explain how any particular document falls within the ambit of the attorney-client privilege. Instead, Microtune seems to assume that all documents relating to the investigation of its stock option granting practices are protected from discovery because they were made by or sent to outside counsel. Such a categorical approach to the attorney-client privilege is improper. *See Navigant Consulting*, 220 F.R.D. at 474, *citing Greene, Tweed of Delaware, Inc. v. DuPont Dow Elastomers, L.L.C.*, 202

F.R.D. 418, 423 (E.D. Pa. 2001) ("A proper claim of privilege requires a specific designation and description of the documents within its scope as well as precise and certain reasons for preserving their confidentiality."). The privilege protects only confidential communications made to a lawyer or his subordinate for the primary purpose of securing either a legal opinion, legal services, or assistance in a legal proceeding. *See Robinson*, 121 F.3d at 974. The evidence submitted by Microtune does not come close to making this showing.

In view of this stunning lack of evidence, the court ordered Microtune to produce a sampling of the challenged documents for *in camera* review. Even after conducting that review, the court is unable to determine whether the documents are privileged. *See Pippenger*, 883 F.Supp. at 1212 (attempt to determine existence of privilege absent adequate factual foundation wastes judicial time and resources). Although some of the documents contain information that *may* have been communicated to or from counsel for the purpose securing legal advice, (*see, e.g.*, Docs. 71, 263, 371, 375, 412, 413, 414, 415, 532), neither the documents themselves nor Microtune's other evidence is sufficient to enable the court to reach that conclusion. Microtune has failed to meet its burden of proving the attorney-client privilege with respect to any of the 66 documents withheld from production on that basis.

2.

Even if some or all of the documents at issue constitute privileged attorney-client communications, the court finds that the privilege has been waived. Generally, a party waives the attorney-client privilege when it voluntarily discloses the privileged communication to a third party. *See Alldread v. City of Grenada*, 988 F.2d 1425, 1434 (5th Cir. 1993). When a party waives the attorney-client privilege, it waives the privilege as to all communications that pertain to the same

subject matter of the waived communication. *See S.E.C. v. Brady*, 238 F.R.D. 429, 441 (N.D. Tex. 2006) (Ramirez, J.).

Here, there is overwhelming evidence that the Audit Committee and Andrews Kurth voluntarily disclosed to third parties a significant amount of allegedly confidential information pertaining to the internal investigation of Microtune's stock option practices. An outside auditing firm, Ernst & Young LLP ("Ernst & Young"), regularly attended meetings with Andrews Kurth where sensitive aspects of the investigation were discussed at length. (*See* Def. Mot. App. at 168-263). The Audit Committee also shared the results of its investigation with Microtune's Board of Directors, the Nasdaq Listing Qualifications Panel, and the SEC. (*Id.* at 1-56, 265-82, 512-93). Microtune and Andrews Kurth provided the SEC with approximately 30,000 pages of documents relating to the investigation, including some documents that Andrews Kurth admits may have been privileged. (*See* Microtune Mot. App. at A8, ¶¶ 10-11). The voluntary disclosure of otherwise privileged communications waives the attorney-client privilege with respect to all documents relating to the internal investigation of the company's stock option practices. *Brady*, 238 F.R.D. at 441; *see also In re OM Securities Litigation*, 226 F.R.D. 579, 592 (N.D. Ohio 2005) (audit committee waived attorney-client privilege with respect to documents that related to, referred to, or were relied on in a presentation to the company's board of directors about an internal investigation of inventory problems).

Microtune contends that the subject matter waiver doctrine does not apply because it is "a third party who takes no position in these proceedings" and does not seek to gain a tactical or other advantage through the use of privileged materials. (*See* Microtune Mem. Br. at 9).[3] While fairness

---

[3] This argument is inconsistent with Microtune's assertion that the majority of documents withheld from production constitute work product. Under the plain language of Rule 26(b)(3), only a party can claim work product protection. *See, e.g. FTC v. Grolier*, 462 U.S. 19, 25, 103 S.Ct. 2209, 2213, 76 L.Ed.2d 387 (1983) (dictum);

can be considered in the court's analysis of subject matter waiver, *see In re Leslie Fay Cos., Inc. Securities Litig.*, 161 F.R.D. 274, 282-83 (S.D.N.Y. 1995), it is not a factor in this case. Microtune was a party to the litigation before it settled with the SEC. As a result of that settlement, the company has been permanently enjoined from violating the federal securities laws. The SEC is still pursuing its claims against two former Microtune officers, Bartek and Richardson. Among other relief requested, the SEC seeks to have the individual defendants disgorge all wrongfully obtained funds and benefits, pay civil monetary penalties, reimburse Microtune for bonuses and stock profits, and be barred from serving as officers or directors of any public company. (*See* Plf. Am. Compl. at 58, ¶¶ III-VI). Under these circumstances, fairness dictates that the defendants be allowed to review all documents relating to the internal investigation conducted by the Audit Committee and its outside lawyers and consultants.

B.

The court next considers whether the documents subpoenaed from Microtune, Andrews Kurth, and Grant Thornton constitute work product.

1.

The federal work product doctrine, as codified in Fed. R. Civ. P. 26(b)(3), provides for the qualified protection of documents and tangible things prepared by or for a party or that party's representative "in anticipation of litigation or for trial." FED. R. CIV. P. 26(b)(3). Determining

---

*Tambourine Comercio Internacional SA v. Solowsky*, 312 Fed.Appx. 263, 284, 2009 WL 378644 at *16 (11th Cir. Feb. 17, 2009); *Arkwright Mut. Ins. Co. v. National Union Fire Ins. Co. of Pittsburgh*, 19 F.3d 1432 (Table), 1994 WL 58999 at *4 (6th Cir. 1994); *In re California Public Utilities Com'n*, 892 F.2d 778, 781 (9th Cir. 1989); *In re Polypropylene Carpet Antitrust Litig.*, 181 F.R.D. 680, 691 (N.D. Ga. 1998); *Gomez v. City of Nashua*, 126 F.R.D. 432, 434 n.1 (D.N.H. 1989); *Chaney v. Slack*, 99 F.R.D. 531, 533 (S.D. Ga. 1983); *Galambus v. Consolidated Freightways Corp.*, 64 F.R.D. 468, 473 (N.D. Ind. 1974). *See also* 8 C. Wright & A. Miller, FEDERAL PRACTICE AND PROCEDURE § 2024, at 354 (2d ed. 1994) ("Documents prepared for one who is not a party to the present suit are wholly unprotected by Rule 26(b)(3) even though the person may be a party to a closely related lawsuit in which he will be disadvantaged if he must disclose in the present suit.").

whether a document is prepared in anticipation of litigation is a "slippery task." *Mims v. Dallas County*, 230 F.R.D. 479, 483 (N.D. Tex. 2005) (Kaplan, J.), *citing United States v. El Paso Co.*, 682 F.2d 530, 542 (5th Cir. 1982), *cert. denied*, 104 S.Ct. 1927 (1984). A document need not be generated in the course of an ongoing lawsuit in order to qualify for work product protection. *Id.* However, "the primary motivating purpose" behind the creation of the document must be to aid in possible future litigation. *In re Kaiser Aluminum & Chemical Co.*, 214 F.3d 586, 593 (5th Cir. 2000), *cert. denied*, 121 S.Ct. 1354 (2001); *United States v. Davis*, 636 F.2d 1028, 1039 (5th Cir.), *cert. denied*, 102 S.Ct. 320 (1981). As the advisory committee notes to Rule 26(b)(3) make clear, "[m]aterials assembled in the ordinary course of business, or pursuant to public requirements unrelated to litigation, or for other nonlitigation purposes are not under the qualified immunity provided by this subdivision." FED. R. CIV. P. 26, adv. comm. notes; *see also El Paso Co.*, 682 F.2d at 542. Among the factors relevant to determining the primary motivation for creating a document are "the retention of counsel and his involvement in the generation of the document and whether it was a routine practice to prepare that type of document or whether the document was instead prepared in response to a particular circumstance." *Navigant Consulting*, 220 F.R.D. at 477, *quoting Electronic Data Systems Corp. v. Steingraber*, No. 4-02-CV-225, 2003 WL 21653414 at *5 (E.D. Tex. Jul. 9, 2003). If the document would have been created without regard to whether litigation was expected to ensue, it was made in the ordinary course of business and not in anticipation of litigation. *Id.*

Like all privileges, the work product doctrine must be strictly construed. *Mims*, 230 F.R.D. at 484; *see also McCook Metals L.L.C. v. Alcoa, Inc.*, 192 F.R.D. 242, 260 (N.D. Ill. 2000) (work product doctrine "significantly restricts the scope of discovery and must be narrowly construed in order to aid in the search for the truth"); *Republican Party of North Carolina v. Martin*, 136 F.R.D.

421, 429 (E.D.N.C. 1991) (same). The burden is on the party who seeks work product protection to show that the materials at issue were prepared by its representative in anticipation of litigation or for trial. *See Mims*, 230 F.R.D. at 484.

2.

The threshold issue in determining whether the documents withheld by Microtune, Andrews Kurth, and Grant Thornton are entitled to work product protection is whether the materials were prepared "in anticipation of litigation." In an attempt to meet this burden, Microtune relies primarily on the declaration of Anthony J. LeVecchio, Chair of the Audit Committee. According to LeVecchio, the Audit Committee and Microtune "anticipated from the outset of its self-initiated internal investigation that the SEC and perhaps other governmental or regulatory bodies would initiate investigations or inquiries into the Company's stock option practices." (Microtune Mot. App. at A3, ¶ 4). This apprehension was based on "the early findings of management, the Company's past investigation experiences with the [SEC], and advice given by the Audit Committee's independent counsel, Andrews Kurth, LLP[.]" (*Id.*). LeVecchio further states that the Audit Committee anticipated the possibility of civil litigation because of numerous shareholder derivative lawsuits involving stock option backdating at other public companies, and the determination early in the investigation that Microtune would have to restate certain of its financial statements. (*Id.* at A3, ¶ 7). Notwithstanding this self-serving testimony, other evidence in the record suggests that litigation concerns were not the primary motivating purpose behind the internal investigation. When asked at his deposition to explain the purpose of the investigation, J. David Washburn responded:

> To understand the company's stock option granting practices and determine whether or not that was consistent with generally accepted accounting principles, to assist the audit committee with appropriate remedial measures, to assist the company with the restatement, to determine whether or not [Ernst & Young] could remain as the

>company's outside auditors and would remain as the company's outside auditors.

(Def. Mot. App. at 73). Washburn never mentioned that preparing for litigation was a purpose of the investigation, much less the primary motivating purpose.

Moreover, most of the documents reviewed by the court *in camera* appear to have been prepared for business purposes, such as negotiating the terms of the company's insurance policies, ratifying invalid stock option grants, developing new corporate "best practices," and restating the company's financial disclosures. (*See, e.g.* Docs. 63, 64, 145, 148, 290, 303, 305, 358, 375, 376, 432). *In re OM Securities Litigation*, 226 F.R.D. at 587 (accuracy of earnings and financial statements is clearly a business matter for all publicly-held corporations, regardless of whether litigation is pending or anticipated). Only a handful of documents arguably relate to potential litigation involving Microtune's stock option granting practices. (*See, e.g.* Docs. 177, 263, 321). That the SEC had initiated an informal investigation when the documents were created is not dispositive, especially in light of the fact that the investigation was triggered by the company's self-reporting of wrongdoing. *See Steingraber*, 2003 WL 21653414 at *5, *quoting Caremark, Inc. v. Affiliated Computer Servs., Inc.*, 195 F.R.D. 610, 614 (N.D. Ill. 2000) ("Not every document generated by an internal investigation is protected by the work product doctrine 'simply because a company's internal investigation is coexistent with a present or anticipated lawsuit that is the same subject matter of the litigation.'").

In sum, the court concludes that Microtune and its lawyers would have created most of the documents at issue for business purposes, regardless of the prospects of litigation. The company has not established that "the primary motivating purpose" behind the creation of any of the documents was to aid in possible future litigation. Thus, the documents are not protected by the

work product doctrine.[4] *In re Kidder Peabody Securities Litigation*, 168 F.R.D. 459, 463 (S.D.N.Y. 1996) (documents generated during internal investigation of defendant corporation regarding scheme by trader to inflate earnings reports were not protected work-product since the documents were not created principally or exclusively to assist in contemplated or ongoing litigation; inquiry was required for pressing business purposes and thus would have been undertaken regardless of whether litigation was threatened); *see also Allied Irish Banks v. Bank of America, N.A.*, 240 F.R.D. 96 (S.D.N.Y. 2007) (documents created by law firm hired to investigate alleged foreign currency trading scheme and make recommendations for changes were not protected by the work product doctrine where party asserting privilege failed to present any testimony that the documents would not have been prepared without the threat of litigation); *In re OM Securities Litigation*, 226 F.R.D. at 587 (documents prepared in connection with audit committee's investigation of corporation's inventory problems, which began after shareholder litigation had been commenced, would have been prepared regardless of the possibility of additional litigation, and therefore documents were not protected by work product doctrine).

## CONCLUSION

Defendants' joint motion to compel compliance with a subpoena [Doc. #56] is granted, and Microtune's motion to quash [Doc. #57] is denied. The court determines that none of the documents subpoenaed by defendants from Microtune, Inc., Andrews Kurth LLP, Wilson Sonsini Goodrich & Rosati, DLA Piper LLP, Baker Botts LLP, and Grant Thornton LLP are protected by the attorney-

---

[4] The resolution of this issue pretermits consideration of defendants' alternative argument that Microtune and its attorneys have waived any work product protection by disclosing certain documents to third parties. However, the court notes that unlike the attorney-client privilege, there is no broad subject matter waiver of work product materials. Instead, the disclosure of work product to a third party waives protection only as to the materials actually disclosed. *See Brady*, 238 F.R.D. at 444; *Varel v. Banc One Capital Partners, Inc.*, No. 3-03-CV-1614-R, 1997 WL 86457 at *4 (N.D. Tex. Feb. 25, 1997) (Boyle, J.). In this case, Microtune already has produced to defendants all work product materials that were disclosed to the SEC.

client privilege or the work product doctrine. Accordingly, those documents shall be produced to counsel for defendants by **June 19, 2009,** unless otherwise agreed to by the parties.

SO ORDERED.

DATED: June 4, 2009.

JEFF KAPLAN
UNITED STATES MAGISTRATE JUDGE